PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CAROLINA CASUALTY INS. CO., | ) | |
| | ) | CASE NO. 1:10cv2492 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| GALLAGHER SHARP, *et al.*, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** [Regarding ECF Nos. 81; 82; 83; |
| Defendants. | ) | 84] |

This matter is before the Court on the cross Motions for Summary Judgment filed by

Plaintiff/Counter-Defendant Carolina Casualty Insurance Co. ("Carolina") and

Defendants/Counter-Claimants Gallagher Sharp, Robert Eddy and Alton Stephens (collectively,

"Defendants").  ECF Nos. 81; 82; 83; 84.[1]  The parties responded (ECF Nos. 90; 91; 92; 93) and

replied (ECF Nos. 97; 98; 99; 100).  For the reasons that follow, the Court grants in part

Carolina's motion for summary judgment and denies Defendants' motion.

**I. Background**

**A.  Undisputed Facts**

This legal malpractice case arises out of an underlying legal malpractice case filed in

2002 against the law firm Goodman Weiss Miller LLP ("Goodman").  ECF No. 82-1 at 5.  That

underlying legal malpractice action was filed by Goodman's former clients, Environmental

Network Corporation and Environmental Network and Management Corporation (collectively,

---

[1]  The parties filed their motions and supporting briefs under seal and also filed redacted versions, resulting in a total of four motions for summary judgment having been filed.  The Court refers to the un-redacted sealed motions in the balance of the opinion.

(1:10cv2492)

"ENC").  ECF No. 82-1 at 5.  Carolina administered a professional liability insurance policy for

the defense of the case against Goodman.  ECF No. 82-1 at 5.  The policy had a limit of

$3,000,000 and was a "declining limits" policy, whereby the liability limit was reduced with the

expenditure of defense fees and costs.  ECF No. 84-1 at 8.  Carolina hired Alton Stephens and

Robert Eddy, partners of the Gallagher Sharp law firm, to represent Goodman.  ECF Nos 1 at 2;

82-1 at 5.

### 1. The High-Low Agreements

During trial, in September 2005, the parties to the ENC lawsuit entered into a "high-low"

settlement agreement (hereafter the "2005 high-low," or "first high-low") which was designed to

cap the amount that ENC could recover in the event that they prevailed on their claims while at

the same time guaranteeing them a minimum recovery if they lost.  ECF No. 82-1 at 8.  The

"high" component was to be the amount of the remaining policy limits, and the "low" component

was to be $100,000.  ECF No. 84-1 at 9.  If a jury awarded an amount in excess of the policy

limit, Goodman would be required to pay the excess.  ECF No. 84-1 at 11.  The 2005 high-low

agreement, therefore, ensured that Goodman would not be liable for an amount in excess of the

policy limit.  ECF No. 84-1 at 12.

In October 2005, the jury returned a verdict in favor of ENC on its malpractice claim.

ECF No. 82-1 at 8.  The jury awarded ENC $2,419,616.81, approximately $100,000 in excess of

what was then remaining on the Carolina policy.  ECF No. 84-1 at 11.  Thereafter, ENC

repudiated the high-low agreement, claiming that it was unenforceable.  ECF No. 82-1 at 8-9.  As

a result, in June 2006, Goodman and Carolina filed a declaratory action in the Hamilton County

2

(1:10cv2492)

Court of Common Pleas seeking to have the agreement declared valid and binding.[2]  ECF No. 82-1 at 9.  The Hamilton County Court found that the high-low agreement was unenforceable. ECF No. 84-1 at 12.

Goodman appealed the ENC jury verdict to Ohio's Eighth District Court of Appeals, which affirmed the "judgment of the trial court" in March 2007.  ECF No. 1 at 3.  Goodman then appealed to the Ohio Supreme Court.  ECF No. 91 at 12.  On or about August 24, 2007, ENC, Goodman and Carolina entered into a new high-low agreement (the "second high-low agreement") in which the low component was to be $1.75 million.  ECF No. 84-1 at 13.  At that time, Goodman's potential exposure in excess of the policy limits was $700,000.  ECF No. 84-8 at 42.  The Ohio Supreme Court reversed the judgment of the Court of Appeals on August 6, 2008, and remanded the ENC lawsuit to the trial court for entry of final judgment in favor of Goodman.  ECF No. 1 at 3.

### 2. The Tolling Agreement

On December 20, 2007, prior to the Ohio Supreme Court issuing its ruling, Carolina, Goodman and Gallagher Sharp entered into a Confidential Tolling Agreement ("Tolling Agreement").  ECF No. 84-1 at 13.  The Tolling Agreement was signed by Alan Petrov, the Managing Partner of Gallagher Sharp, and purported to bind Defendants to the agreement.  ECF No. 84-1 at 13.  The agreement tolled the statute of limitations and all other time-related defenses.  ECF No. 84-1 at 13-14.

---

[2]  Goodman was represented by the Taft Firm in the Hamilton County Court lawsuit. ECF No. 100 at 16.

(1:10cv2492)

### B.  The Claims

Carolina brought this legal malpractice action against Defendants, alleging that attorneys Robert Eddy and Alton Stephens were negligent in drafting the 2005 high-low agreement thus rendering it unenforceable.  ECF No. 1 at 2, 4.  Carolina alleges that the Defendants' negligence caused Carolina to pay the low amount specified under the terms of the second high-low agreement, $1.75 million, rather than the $100,000 amount that Carolina would have been obligated to pay under the terms of the 2005 high-low agreement.  ECF Nos. 1 at 4; 84-1 at 13.

Defendants deny the allegations and further assert the affirmative defense of statute of limitations, arguing that the Tolling Agreement does not bind the individuals Eddy and Stephens.[3]  ECF Nos. 36 at 3; 82-1 at 7.  Carolina moves the Court for summary judgment on the issues of standing, statute of limitations and liability; Defendants move the Court for summary judgment on the issues of standing and statute of limitations.  ECF Nos. 82; 84 at 1-2.

## II.  Legal Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).  A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

---

[3]  Defendants also asserted a Counterclaim for recovery of outstanding fees for legal services from July 27, 2007 until December 8, 2009.  ECF No. 36 at 5.  The parties did not move for summary judgment on that counterclaim.

4

(1:10cv2492)

of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Entry of summary

judgment is appropriate "against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  *Id.* at 322-23.

### III.  Discussion

#### A.  Standing

Defendants argues that Carolina lacks standing to assert a malpractice claim against them.

ECF No. 82-1 at 12.  Defendants assert that in order to maintain a legal malpractice action

against an attorney, a plaintiff must establish that it was the attorney's client or that it was in

privity with the attorney's client, neither of which, they argue, apply to Carolina.[4]  ECF No. 82-1

at 12.  Carolina contends that it was in privity with Goodman at the time the alleged malpractice

occurred and, thus, has standing to sue.  ECF No. 91 at 14.

"An attorney is immune from liability to third persons arising from his performance as an

attorney in good faith on behalf of, and with the knowledge of his client, unless such third person

is in privity with the client or the attorney acts maliciously."  *Scholler v. Scholler*, 462 N.E.2d

158, 159-160 (Ohio 1984).  The Supreme Court of Ohio defines privity as "[t]he connection or

relationship between two parties, each having a legally recognized interest in the same subject

matter."  *Shoemaker v. Gindlesberger*, 887 N.E.2d 1167, 1170 (2008) (citing Black's Law

Dictionary 8th ed. 2004).  In the context of legal malpractice, "privity between a third person and

---

[4] Defendants asserted similar arguments in their Motion to Dismiss, which the Court
denied.  ECF No. 32.

5

(1:10cv2492)

the client exists where the client and the third person share a mutual or successive right of property or other interest." *CardioGrip Corp. v. Mueller and Smith, L.P.A.*, 2008 WL 150000, at *5 (S.D.Ohio Jan. 14, 2008) (citing *Sayyah v. Cuttrell*, 757 N.E.2d. 779, 787 (Ohio Ct. App. 2001)).  "Privity exists if the interest of the client is concurrent [*i.e.*, mutuality of interest] with the interest of the third person." *Id.*

Both parties rely upon *Swiss Reinsurance Am. Corp., v. Roetzel & Andress*, 837 N.E.2d 1215 (Ohio Ct. App. 2005).  In *Roetzel*, a doctor was sued for malpractice and his liability insurer retained an attorney to represent him.  *Id.* at 1218.  The attorney eventually urged both the insurance company and the doctor to settle the case.  *Id.*  While the doctor agreed to settle, the insurance company refused.  *Id*  When the insurance company brought suit for legal malpractice against the attorney, the court found that the insurance company and the doctor were not in privity because the insurer and the doctor's interests were in "clear conflict."  *Id.* at 1222-23.

Defendants argue that privity does not exist between Carolina and Goodman because their interests were in clear conflict.  ECF No. 82-1 at 17.  Defendants assert that the "divergence of interests with respect to settlement that the [*Roetzel*] court recognized is inherent in every insurer-insured relationship where, as here, there is the possibility of a judgment in excess of the insurance policy limits."  ECF No. 82-1 at 17.  The *Roetzel* court did not make such a finding. Instead, *Roetzel* considered the facts of the case and concluded that, because the insured urged settlement and the insurer repeatedly refused to engage in settlement, the parties interests, "while in harmony at the inception of the case, . . . diverged quickly."  837 N.E.2d at 1223.  In the

6

(1:10cv2492)

instant case, it, therefore, cannot be said that the mere identity of the parties and the existence of

a partial settlement, the 2005 high-low agreement, inherently precludes a finding of privity.

Privity does not equate to identical interests; rather, privity exists when the interests of one

adequately represents the interests of another.  *See* <u>*Sayyah*, 142 Ohio App.3d at 112</u>.[5]

     Carolina has established that the interests of Carolina and Goodman were aligned and did

not diverge before and with respect to entering into the 2005 high-low agreement.  Carolina

submitted evidence that both Carolina and Goodman sought to protect Goodman from any

exposure in excess of the policy limit— Goodman had an interest in eliminating potential

exposure beyond the amount covered by insurance and Carolina had an interest in upholding its

obligation under the insurance contract as well as the obligation imposed on insurers under Ohio

law.  <u>ECF Nos. 84-1 at 18</u>; <u>91 at 21</u>; <u>84-2 at 36; 84-8 at 9; 84-13 at 25</u>.  The fact that Goodman

also sought to retain a right to appeal does not create divergent interests, as Defendants allege.[6]

---

    [5] In further support of their argument that an inherent conflict exists thereby precluding
standing, Defendants cite numerous cases from other Federal circuits.  <u>ECF No. 97 at 7-8</u>.  These
cases are not entirely on point, and, in any event, are consistent with *Roetzel*.  *E.g.* <u>*R.G. Wegman*</u>
<u>*Constr. Co. v. Admiral Ins. Co.*, 629 F.3d 724, 728 (7th Cir. 2011)</u> (finding a conflict of interest
because the insurer confessed that it was "gambling on minimizing its liability at the expense, if
necessary, of [the insured].").  As noted, in the instant case there is no evidence that Carolina
sought to minimize its liability at the expense of Goodman— quite the reverse, in fact— and
Carolina readily agreed to the 2005 high-low settlement agreement.

    [6] Defendants allege that Goodman did not want to settle the case and that Carolina forced
Goodman to settle.  <u>ECF No. 82-1 at 18</u>.  Carolina points out that Defendants do not specify
when this allegedly occurred, and that what Defendants reference occurred during negotiations
for a second settlement agreement, wherein the parties were discussing the potential of a straight
settlement that would have disposed of the case, rather than another high-low agreement.  <u>ECF</u>
<u>No. 91 at 19</u>.  Carolina's version of these events is supported by the record, and do not affect the
finding that the interests of Carolina and Goodman were aligned at the time of the alleged
malpractice.  *See* <u>ECF No. 84-8 at 33-37</u> (Miller transcript describing settlement negotiations

(1:10cv2492)

ECF Nos. 82-1 at 18; 84-2 at 36.

Defendants trot out other conflicts that allegedly arose between Carolina and Goodman in the hopes of destroying privity, none of them availing.  That Carolina and Goodman initially disagreed as to whether Defendants should be hired to represent Goodman does not evince a divergence of interest.  ECF No. 82-1 at 17.  Nor does the fact that a side-agreement was entered into by Goodman and ENC prior to the 2005 high-low agreement, as the side agreement did not change the aforementioned interests of Carolina and Goodman.[7]

Additionally, Defendants point to further alleged disagreements between Carolina and Goodman that occurred after the 2005 high-low agreement.  ECF No. 82-1 at 18-19.  However, any disagreements that may have occurred after the 2005 high-low agreement does not destroy the mutuality of interests Carolina and Goodman had at the time the alleged malpractice occurred.[8]  *See Roetzel*, 837 N.E.2d at 1223 (finding an active conflict after analyzing the conflicts in the underlying litigation related to the settlement dispute); *Macken v. KDR Holdings, 2007 WL 2296431, at *3-4 (Ohio Ct. App. Aug. 13, 2007)* (finding that privity existed because

---

prior to the second high-low agreement).

[7] Carolina did not know about the side agreement, therefore, it could not have effected Carolina's interests at the time.  *See* ECF No. 84-2 at 13-14.  Though the side agreement, entered into by ENC and Goodman regarding Goodman's counterclaim for fees, appeared to offer consolation payment to Goodman if ENC prevailed in the underlying case, Goodman's interest was still in limiting any liability for excess judgment and, ultimately, success on appeal.  *See* ECF No. 84-2 at 15; 84-8 at 9.

[8] For example, Defendants point out that, after the verdict, Goodman wanted to retain Defendants for the appeal, while Carolina wanted to hire different counsel.  ECF No. 82-1 at 19.  As noted, this occurred after the alleged malpractice of Defendants and does not impair the mutuality of interests between the parties leading up to the 2005 high-low agreement.

(1:10cv2492)

the third-party and the client's interests were aligned at the time the attorney prepared the defective mortgage deed that was the subject of the malpractice claim); *CardioGrip*, 2008 WL 150000, at *7 ("in determining issues of privity and vesting, the status of those seeking to sue must be examined at the time the claimed mistakes occurred." (citing *Lewis v. Star Bank, N.A., Butler Cty.*, 630 N.E.2d 418, 420 (Ohio Ct. App. 1993)))).

For the reasons provided, the Court finds that privity existed between Carolina and Goodman prior to the 2005 high-low agreement, and Carolina has standing to bring its claim for legal malpractice against Defendants.

### B.  The Tolling Agreement

In a prior ruling, the Court determined that Allen Petrov, Gallagher Sharp's managing partner, had the authority to bind individual partners Eddy and Stephens upon signing the Tolling Agreement.  ECF No. 32 at 12.[9]  Defendants now contend that the evidence shows that the parties to the agreement intended to toll claims only against Gallagher Sharp.  ECF No. 82-1 at 22.  The evidence presented by Defendants include prior drafts of the agreement in addition to communications of negotiations occurring contemporaneously with the drafting.  ECF No. 97 at 10; 97-1; 97-2.  Carolina, in turn, argues that the plain language of the Tolling Agreement states that the agreement is binding on Eddy and Stephens and that Petrov had the authority to bind them.  ECF No. 99 at 20.

---

[9]  The parties agree that, pursuant to *Nat'l. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939, 943, 945 (Ohio 2009), law firms cannot be sued directly for legal malpractice, but may be vicariously liable for legal malpractice when individual attorneys are liable.  ECF Nos. 82-1 at 22; 91 at 23.

9

(1:10cv2492)

### 1.  Plain Language

Carolina asserts that the plain language of the Tolling Agreement states that the

agreement is binding on partners, employees and/or attorneys at Gallagher Sharp, which includes

Eddy and Stephens.  ECF No. 99 at 20.  The Tolling Agreement was entered into by Carolina,

Goodman and Gallagher Sharp and reads, in pertinent part,

> [E]ach of the parties agrees and acknowledges that this Agreement and the
> contents hereunder is binding and adheres to the Party . . . and shall be binding on
> all successors, affiliates, shareholders, corporations, parent corporation,
> subsidiaries, divisions,  partners, firms, partnerships, agents, employees, attorneys,
> representatives, . . . of any of the Parties hereto in any capacity including past,
> present, future or otherwise, and all others with liabilities derivative of them or
> rights through them.

ECF No. 11 at 2.  Because Eddy and Stephens were partners of Gallagher Sharp, Carolina

asserts, the plain language of the agreement binds them.  ECF No. 99 at 19.

"Under Ohio law, the interpretation of written contract terms, including the determination

of whether those terms are ambiguous, is a matter of law for initial determination by the court."

*Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008).  "The intent of the parties is

presumed to reside in the language they choose to use in their agreement."  *Graham v. Drydock

Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996).  "A court 'is not permitted to alter a lawful contract

by imputing an intent contrary to that expressed by the parties' in the terms of their written

contract."  *Savedoff*, 524 F.3d at 763 (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256,

1261-62 (Ohio 2003)).  The intent of the parties, as unequivocally expressed by the language of

the written contract, is that the agreement would be binding upon the partners of Gallagher

Sharp.  That language binds Eddy and Stephens.

10

(1:10cv2492)

Defendants argue that the provision quoted above is a commonly used contract provision designed "merely to confirm that the substantive terms of the agreement will be binding on all successors to the parties." ECF No. 93 at 20.  Defendants do not cite legal authority in support of its argument that the Court should ignore the obvious inclusion of the term "partners" in text negotiated by presumably sophisticated parties.  *See Trustees of Painting Industry Ins. Fund v. Pharaoh Glass Systems, Inc., 2008 WL 276412, at *6 (N.D.Ohio January 31, 2008)* ("the [ ] clause was a part of a contract that Defendant's president signed, and even if it was 'boilerplate', it was nevertheless part of a negotiated contract between fairly sophisticated parties."). Therefore, the Court finds the terms of the agreement are unambiguous and the plain language binds Eddy and Stephens.

### 2.  Prior Negotiations and Drafts

Defendants argue that Petrov, the managing partner who signed the Tolling Agreement, disclaimed any apparent authority to bind Eddy and Stephens as individuals to Carolina when negotiating the terms of the Tolling Agreement.  ECF Nos. 93 at 20; 97 at 10.  Carolina retorts that, even if Petrov did not intend to bind Eddy and Stephens to the Tolling Agreement, such evidence is irrelevant because Ohio contract law precludes considering that evidence in the face of unambiguous contract terms.  ECF No. 91 at 25.

Because the plain language of the agreement states that the agreement is binding on all partners, the Tolling Agreement is not ambiguous, and the Court may look no further than the writing itself to find the intent of the parties.  *See Savedoff*, 524 F.3d at 763; *Westfield*, 797 N.E.2d at 1261.  Thus, the Court may not consider evidence of prior negotiations and drafts of

11

(1:10cv2492)

the Tolling Agreement to impute a contrary intent to that expressed by the parties in the Tolling

Agreement.

### 3.  Petrov's Authority to Bind Eddy and Stephens Individually

Defendants argue that even if the Tolling Agreement could be read as purporting to waive

the rights of Eddy and Stephens, Petrov disclaimed any such authority and, therefore, Carolina

could not have reasonably relied on Petrov's apparent authority.  ECF No. 97 at 13.  Defendants

quote Ohio partnership law, which provides,

> Every partner is an agent of the partnership for purposes of its business, and the
> act of every partner, including the execution in the partnership name of any
> instrument, for apparently carrying on in the usual way the business of the
> partnership of which he is a member binds the partnership, unless the partner so
> acting has in fact no authority to act for the partnership in particular matter, *and*
> the person with whom he is dealing has knowledge of the fact that he has no such
> authority.

R.C. 1775.08(A) (emphasis added).  Even assuming, *arguendo*, that Petrov conclusively

disclaimed his authority to bind individual partners, Petrov, as the Court has previously

determined, did "in fact" have authority to act for the partnership and, in so doing, to bind Eddy

and Stephens individually to the agreement.[10]  ECF Nos. 32 at 12; 84-22 at 25; 84-23 at 8.

Because Petrov had the requisite authority to enter into the Tolling Agreement and its

plain language binds Eddy and Stephens, Carolina's action is not time-barred.

---

[10]  Defendants argue that Petrov did have authority to enter into the Tolling Agreement on
behalf of Gallagher Sharp, but not the individual attorneys.  ECF No. 97 at 13.  As noted, the
Court already determined Petrov did have the authority to bind Eddy and Stephens, and
Defendants' legally unsupported argument to the contrary does not persuade the Court otherwise.

(1:10cv2492)

### C. Liability

"To establish a cause of action for legal malpractice under Ohio law, 'a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss.'" *Sasaya v. Earle*, 2012 WL 314159, at *4 (N.D.Ohio Feb. 1, 2012) (quoting *Vahila v. Hall*, 674 N.E.2d 1164 (Ohio 1997) (syllabus).  "The plaintiff's failure to prove any one of these elements entitles the defendant-attorney to summary judgment." *Sasaya*, 2012 WL 314159, at *4 (quoting *Simmons v. Rauser & Assoc., L.P.A.*, 2011 WL 3925624, at *2 (Ohio Ct. App. Sept. 8, 2011)).

### 1. Duty

As discussed  in the standing section, *supra*, the Court has determined there was privity between Carolina and Goodman.  Accordingly, the Court finds that Defendants owed a duty or obligation to Carolina.  *See Macken*, 2007 WL 2296431, at *3  (in the context of legal malpractice, an attorney may be liable if the third party is in privity with the client, citing *Simon v. Zipperstein*, 512 N.E.2d 636, 638 (Ohio 1987)).

### 2. Breach

Carolina asserts that under Ohio law, legal malpractice may be decided as a matter of law in cases wherein an attorney's breach is obvious.  ECF No. 84-1 at 18.  Carolina urges that the instant case is one such case because Goodman and ENC reached an agreement on the terms of the 2005 high-low agreement; Defendants were tasked with reducing the agreement to writing;

13

(1:10cv2492)

and the agreement was found unenforceable by the Hamilton County Court.  ECF No. 84-1 at 19.

Because Stephens and Eddy did not abide by their client's instructions in drafting the 2005 high-

low agreement as an enforceable contract, Carolina argues, they committed malpractice.  ECF

No. 84-1 at 19.  Defendants retort that the exception allowing legal malpractice to be determined

as matter of law is very narrow and not applicable to the instant case.  ECF No. 93 at 10.

Specifically, Defendants argue that a genuine issue of material fact exists as to whether

Defendants were tasked with preparing the 2005 high-low agreement and whether they were ever

informed that the document was intended to be a final agreement.  ECF No. 93 at 10, 12.

Pursuant to Ohio law, an attorney's conformance to the standard of care is an issue of fact

on which expert testimony is typically required.  *See, e.g., Sasaya,* 2012 WL 314159, at *9;

*NuTrend Homes v. Law Offces of DeLibera, Lyons & Bibbo,* 2003 WL 1699841, at *7 (Ohio

App. Ct. March 32, 2003); *McInnis v. Hyatt Legal Clinics,* 461 N.E.2d 1295, 1297 (Ohio 1984).

Expert testimony is not required, however, in cases in which the breach is "so obvious that it may

be determined by the court as a matter of law."  *Kreuzer v. Merritt,* 2000 WL 1643794, at *2

(Ohio Ct. App. Nov. 3, 2000) (quoting *Bloom v. Dieckmann,* 464 N.E.2d 187, 188 (Ohio Ct.

App. 1983)).  "The failure to abide by a client's specific instructions may be sufficient to

establish a breach of a professional duty without expert testimony."  *Dimacchia v. Burke,* 904

F.2d 36, at *2 (6th Cir. 1990) (Table) (citing *McInnis,* 461 N.E.2d at 1297).

### a.  Whether Defendants Were Tasked With Reducing the Agreement to Writing

Defendants argue that they were not "tasked with preparing an agreement reflecting a

high-low agreement that the parties had reached."  ECF No. 93 at 10.  Defendants also point out

14

(1:10cv2492)

that Stephens did not negotiate the terms of the 2005 high-low agreement.  ECF No. 93 at 11.

Whether Stephens negotiated the terms of the 2005 high low agreement does not have any

bearing on whether he was tasked with drafting a contract to represent those terms.  The record

reflects that Defendants were tasked with drafting the 2005 high-low agreement.[11]  *See* ECF Nos.

84-12 at 13; 84-4 at 30.  Defendants' assertion that they were not responsible for drafting the

agreement because Stephens merely took notes as Attorney Steven Miller of Goodman and

Attorney Joel Levin representing ENC, "dictated certain terms" to Stephens is of no

consequence.  ECF No. 93 at 11.  Moreover, Defendants' assertion that Miller "wanted us trying

the lawsuit and didn't delegate any responsibility in connection with the high/low agreement or

the Memorandum of Understanding beyond typing it up" is also baseless.  ECF No. 93 at 11.

The fact that Stephens' secretary (rather than Stephens himself) typed the first draft from

Stephens' notes does not absolve Stephens from liability for his role in the creation of the

document.

### b.  Whether Defendants Were Informed that the Agreement Was Intended to Be a Final Agreement

Stephens testified that Miller and Levin negotiated the 2005 high-low agreement in the

hallway during the trial then came to Stephens and told him to draft a high-low agreement

---

[11]  Stephens states, "Steve [Miller] asked me, maybe Steve and Joel [Levin] asked me, . . . he asked me if we would do. . . if I would have my secretary write up a Memorandum of Understanding, and I remember the two of them standing there and me with a legal pad piece of paper writing down what they were telling me."  ECF No. 84-12 at 13.  The next day Defendants brought the Memorandum of Understanding to the court and distributed copies.  ECF No. 84-12 at 13.  Moreover, Stephens modified the draft to reflect the changes made by Miller and Levin. ECF No. 84-12 at 15, 19-21.

15

(1:10cv2492)

representing the terms Miller and Levin had recited.[12]  ECF No. 84-12 at 13.  The record reflects

that Stephens sent out the initial draft; Levin made his changes; Stephens modified the draft to

reflect Levin's changes then send that draft to Miller; Miller made his changes; and Stephens

modified the draft to reflect Miller's changes before presenting the document to the parties for

signing.  ECF Nos. 84-14; 84-15; 84-16; 84-17.

Stephens testified in his deposition that he did not believe that the agreement was

intended to be final.[13]  ECF No. 84-12 at 21-22.  Carolina attempts to refute the integrity of

Stephen's testimony by making much of the fact that the initial agreement included a "paragraph

5" that Levin struck in his edits, thereby putting Stephens on "express notice" that the parties

intended the 2005 high-low agreement to be final.  ECF Nos. 84-1 at 20; 99 at 12-13.  Paragraph

5 stated,

> It is understood by Plaintiffs and Defendants that a formal written agreement will
> be prepared, agreed to and signed by them should they come to a meeting of the
> minds as contemplated by this Memorandum of Understanding, which shall be
> subsumed in and superceded by any such formal written agreement.

ECF No. 84-14 at 3-4.  Carolina argues that when Levin struck this paragraph from the

agreement, Stephens should have known the parties intended the then existing agreement to be

---

[12]  The deposition testimony is in dispute over who initially negotiated the terms of the
agreement — Eddy, Stephens and Levin all state that Levin and Miller to varying degrees
negotiated the 2005 high-low agreement in the hallway during the trial; Miller states that he did
not negotiate that agreement.  *See* ECF Nos. 84-4 at 33-34 (Eddy); 84-12 at 13-15 (Stephens);
84-9 at 4-5 (Levin); 84-8 at 5-7 (Miller).

[13]  Miller testified that he understood the document was intended to memorialize the high-
low agreement he believed had been reached.  ECF No. 84-13 at 23.  Levin testified that he
thought the document was a contract.  ECF No. 84-9 at 7.

(1:10cv2492)

final.  ECF No. 84-1 at 20.

That Levin struck paragraph 5 but not any other full paragraph or language in the draft

undercuts Carolina's argument that the striking of Paragraph 5 should have indicated to Stephens

that the parties intended the agreement to be final.  The agreement, which was titled

"Memorandum of Understanding," also recited,

> 1.  Plaintiffs have *proposed* to Defendants' carrier a "high-low" agreement . . . .
> 2.  Defendants' carrier has *counter-proposed* to Plaintiffs, similar in principle, an agreement subject to certain terms and conditions. . . .
> 3.  The above-referred-to *conditions and modifications* are that . . . .
> 4.  Should knowledge of the agreement [] *contemplated* herein be communicated to any other person or entity by Plaintiff or his counsel, beyond those specifically referenced above, *any such agreement will immediately become null and void*, and *Defendants' proposal to enter into such an agreement shall be immediately withdrawn*.

ECF No. 84-17 at 3-5. (emphasis added).  Despite edits by Attorneys Miller and Levin, the

resulting language clearly indicates a proposal, counterproposal and makes no mention of an

acceptance.  It is, therefore, not obvious that Stephens should have known, from Levin's striking

of paragraph 5, that the parties intended the document to be a final contract.[14]  Therefore, a

genuine issue of material fact exists as to whether Defendants were on notice that the document

they drafted was intended to be a final high-low agreement.

---

[14]  Carolina also points to a letter from Miller to Jackie Noster, the managing general underwriter for Carolina, which was also sent to Stephens.  This letter, Carolina argues, evidences the "clear intent of [Stephens'] client" to be bound by a final agreement.  ECF No. 99 at 12.  The Court disagrees.  The letter sets forth the terms of a high-low agreement between ENC and Goodman but does not otherwise state with specificity that the agreement Stephens was drafting was going to be a final agreement.  *See* ECF No. 84-10 at 3.

(1:10cv2492)

### 3. Causation

Proving proximate cause in a legal malpractice action "generally requires evidence that a result was more likely than not to have been caused by [the attorney's] negligence." *Southern Elec. Supply Co. v. Lienguard, Inc.*, 2007 WL 4224225, at *6 (S.D. Ohio Nov. 27, 2007)(quoting *Huffer v. Cicero*, 667 N.E.2d 1031, 1037 (Ohio Ct. App. 1995)).  The proximate cause determination is ordinarily an issue to be determined by the trier of fact, but "where no facts are alleged justifying any reasonable inference that the acts or failure of the defendant constitute the proximate cause of the injury, there is nothing for the jury [to decide], and, as a matter of law, judgment must be given." *Wesley v. Walraven*, 2013 WL 544053, at *12 (Ohio Ct. App., Feb. 5, 2013) (quoting *Kemerer v. Antwerp Bd. of Education*, 664 N.E.2d 1380, 1383 (Ohio 1995), quoting *Case v. Miami Chevrolet Co.*, 175 N.E.2d 224, 225 (Ohio 1930); *Vermett v. Fred Christian & Sons Co.*, 741 N.E.2d 954, 973 (Ohio Ct. App. 2000)).

Carolina asserts that it is indisputable that the Defendants' alleged negligent drafting of the 2005 high-low agreement caused Carolina damages.  ECF No. 84-1 at 20-21.  Carolina argues that it would have paid only $100,000 to ENC upon the Ohio Supreme Court's reversal and entry of judgment in favor of Goodman if the 2005 high-low agreement had been enforceable, and instead had to pay $1.75 million to ENC, the "low" figure in the second high-low agreement.  ECF No. 84-1 at 20.  Defendants contend that numerous intervening acts occurred after the drafting of the 2005 high-low agreement that caused Carolina's injury, breaking the causal chain.  ECF No. 93 at 13.

In *Mudrich v. Standard Ohio Co., Inc.*, 90 N.E.2d 859, 863 (Ohio 1950), the Ohio

18

(1:10cv2492)

Supreme Court stated,

> Whether an intervening act breaks the causal connection between negligence and
> injury depends upon whether that intervening cause was reasonably foreseeable by
> the one who was guilty of the negligence.  If an injury is the natural and probable
> consequence of a negligent act and it is such as should have been foreseen in the
> light of all the attending circumstances, the injury is then the proximate result of
> the negligence.  It is not necessary that the defendant should have anticipated the
> particular injury.  It is sufficient that his act is likely to result in an injury to some
> one.

See also *Marsh v. Heartland Behavorial Health Ctr.*, 2010 WL 1248290, at *10 (Ohio Ct. App.

March 31, 2010).  Furthermore,

> the test for whether or not an act constitutes an intervening cause is whether the
> original and successive acts may be joined together as a whole, linking each of the
> actors as to the liability, or whether there is a new and independent act or cause
> which intervenes and thereby absolves the original negligent actor.  In this
> context, the word "independent" means the absence of any connection or
> relationship of a cause and effect between the original and subsequent acts of
> negligence.  "New" means that the second act could not have reasonably been
> foreseen.

*Johnson v. Pohlman*, 833 N.E.2d 313, 321 (Ohio Ct. App. 2005) (internal quotations and

citations omitted).

### a.  The Declaratory Judgment Action

The Ohio Supreme Court has stated that when considering proximate cause in legal

malpractice cases, a court need not conduct a "trial within a trial" to show the validity of a

plaintiff's underlying claim.  *Vahila*, 674 N.E.2d at 1169 (quoting Note, *The Standard of Proof of

Causation in Legal Malpractice Cases*, 63 Cornell L.Rev. 666, 670–671 (1978)).  *See also*

*Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 893 N.E.2d 173, 176-77 (Ohio

2008).  In *Vahila*, the Court reversed the appellate court's affirmance of the trial court's grant of

19

(1:10cv2492)

summary judgment to the defendant attorney.  674 N.E.2d at 1167.  The trial court had found that

because the plaintiffs alleging legal malpractice failed to establish they would have been

successful in the underlying action in which the alleged malpractice occurred "but for" the

defendant's alleged breach, the defendants were entitled to summary judgment.  674 N.E.2d at

1167.  The Ohio Supreme Court reversed, rejecting a rule that would require a plaintiff to "prove

in every instance that he or she would have been successful in the underlying matters giving rise

to the complaint."  Id. at 1168-69.

Defendants, in the instant case, urge the Court to consider a slightly different but

analogous scenario.  Defendants argue that Carolina's damages were the result of Carolina's

declaratory judgment action in the Hamilton County Court of Common Pleas which, Defendants

state, should have never been filed.  ECF No. 93 at 13.  Moreover, Defendants assert that the law

firm retained to litigate that action pursued unwise strategies that caused the court to find the

contract unenforceable.  ECF No. 93 at 13-14.  Defendants also present to the Court the case it

believes should have been made to the Hamilton County Court and, pursuant to which,

Defendants aver, " the result almost certainly would have been different."  ECF No. 93 at 15.

The Court is not persuaded by Defendants' arguments.  As an initial matter, the Court

notes that the Hamilton County Court decision is not the underlying case in this malpractice

action as contemplated by Vahila.[15]  Rather, Carolina brought the declaratory action in the

Hamilton County Court seeking to enforce the contract that is the subject of this legal

_____

[15]  The attorneys and firm that litigated the Hamilton County Court declaratory action on
behalf of Carolina and Goodman are not parties to this action.

20

(1:10cv2492)

malpractice action, because ENC refused to honor it.  ECF No. 84-1 at 12.

The Court will not conduct a "trial within a trial" to determine the different possible legal arguments that could have been made in addition to the arguments that were made to the Hamilton County Court.  Nor will the Court speculate about the possibilities of success had Carolina's lawyers adopted the strategy Defendants now present.[16]  *See Vahila*, 674 N.E.2d at 1169.  Moreover, it cannot be said that Carolina somehow behaved inappropriately in attempting to enforce the contract and its rights under it against ENC or that it is unforeseeable that Carolina would have attempted to enforce the contract.  Accordingly, the Court finds that the Hamilton County Court's determination that the 2005 high-low agreement was unenforceable was the natural and probable consequence of any alleged negligence in drafting that high-low agreement; that determination was not the product of a new or independent act or cause; that determination was foreseeable in the light of all the attending circumstances; and that determination was proximately caused by Defendants' alleged negligence.

### b.  The Second High-Low Agreement

The Court is aware that motions for summary judgment on issues of proximate causation and intervening acts generally result in denial due to the existence of questions of fact.  *See Liebreich v. A.J. Regrigeration, Inc.*, 617 N.E.2d 1068, 1071 (Ohio 1993).  Despite that trend, the Court finds that no reasonable factfinder could conclude that the second high-low agreement was not proximately caused by the unenforceability of the first one.  ENC, Goodman and

---

[16] In any event, Defendants' advocated "oral agreement" argument is not supported by the record.  *See* ECF Nos. 84-9 at 7;84-8 at 5.

21

(1:10cv2492)

Carolina sought a partial settlement in the form of the high-low agreements in the underlying

action in order to avoid risking liability in excess of the policy limits. *See* ECF Nos. 84-2 at 37;

84-8 at 33. Indeed, Ohio law requires that insurers consider and, in some cases, accept

settlement offers within policy limits when the insured faces the threat of exposure beyond policy

limits. *See, e.g.,* *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 404 N.E.2d 759, 761 (Ohio 1980)

(citing *Hart v.. Republic Mut. Ins. Co.*, 87 N.E.2d 347, (Ohio 1949)); *Logan v. Allstate Ins. Co.*,

865 N.E.2d 57, 61(Ohio Ct. App. 2006).

 The 2005 high-low agreement was adjudged unenforceable. Therefore, it is foreseeable

that the parties would thereafter have entered into another high-low agreement to replace the

infirmed original agreement. The second high-low agreement was not an independent act. There

is a direct connection and causal relationship between the unenforceability of the 2005 high-low

agreement and the subsequent acts of the same parties whom entered into the second high-low

agreement. More simply put, the second high-low agreement was meant to replace the first.

 Defendants argue that there is a genuine dispute as to whether Carolina's decision to enter

into the second high-low agreement is an intervening cause. Defendants assert that because the

Ohio Supreme Court ultimately reversed the trial court and entered judgment in favor of

Goodman, Carolina "actually benefitted" from the unenforceability of the 2005 high-low

agreement. This interesting perspective on causation could be applied to any proximate

causation analysis without end— one could say that a person injured in a car accident

consequently missed a plane that crashed, thus the negligent acts of the tortfeasor actually

benefitted the injured person, in the grand scheme of things— but the law does not take such a

(1:10cv2492)

philosophical view of causation.  Defendants themselves concede that the Ohio Supreme Court's

decision in favor of Goodman was a "landmark decision that redefined the causation standard for

legal malpractice claims in Ohio."  ECF No. 82-1 at 12.  The Court finds Defendants' argument

that Carolina should have foreseen the ultimate reversal of the trial court to be without merit.

Defendants also advance alternative ways, other than the second high-low agreement, in

which it believes Carolina could have hedged its bet in the underlying malpractice action that

would have resulted in a less than $1.75 million minimum payment to ENC.  ECF No. 93 at 16-

17.  Defendants do not cite legal authority for their arguments and do not respond to Carolina's

assertion that such issues are to be considered in the context of Carolina's duty to mitigate

damages.  ECF No. 84-1 at 22.  See *BP Exploration & Oil Co. v. Maintenance Services, Inc.*, 313

F.3d 936, 946-947 (6th Cir. 2002) (discussing the difference between conduct that has a causal

role in liability versus the mitigation of damages after the injury occurs, citing *Petrolia Corp. v.*

*Elam*, 1992 WL 31299 (6th Cir. Feb. 20, 1992)).  Because such issues are to be considered in the

context of Carolina's duty to mitigate damages, the Court considers Defendants' arguments in

that context.

### 4.  Mitigation of Damages

Carolina argues that it used ordinary and reasonable care in attempting to mitigate its

damages after Defendants' alleged negligence and is therefore entitled to summary judgment.

ECF Nos. 84-1 at 22; 99 at 18.  "As a general rule, 'an injured party has a duty to mitigate and

may not recover for damages that could reasonably have been avoided.'"  *Baird v. Crop Prod.*

*Servs., Inc.*, 2012 WL 3815314, at *8 (Ohio Ct. App. Sept. 4, 2012) (quoting *Chicago Title Ins.*

23

(1:10cv2492)

*Co. v. Huntington Natl. Bank*, 719 N.E.2d 955, 961 (Ohio 1999)).  An injured party is required to

use ordinary and reasonable care, diligence, and prudence.  *Foust v. Valleybrook Realty Co.*, 446

N.E.2d 1122, 1127 (Ohio App. Ct. 1981).

      To the extent Defendants respond to Carolina's mitigation argument, they state that

instead of agreeing to the second high-low which required Carolina to pay $1.75 million as the

low, Carolina could have foregone entering into the second high-low at all, and simply agreed to

pay the $700,000 Goodman would have faced in excess on its policy.[17]  ECF Nos. 93 at 16; 84-8

at 43-44.  Defendants argue that it is unreasonable to pay $1.75 million to eliminate a risk of

paying $700,000.  ECF No. 93 at 17.  Carolina does not respond specifically to Defendants'

argument.  The Court finds that there are genuine issues of material fact regarding whether

Carolina's decision to enter into the second high-low agreement at the agreed upon terms was

reasonable.  Genuine issues of material fact also exist regarding Carolina's decision to litigate

enforcement of the 2005 high-low agreement.  *See Interstate Gas Supply, Inc. v. Calex Corp.*,

2006 WL 328679, at *5 (Ohio Ct. App. 2006) ("Ordinarily, whether a party to a contract used

'reasonable efforts' is a question of fact for the fact finder.").

### IV.  Conclusion

      For the aforementioned reasons, the Court:

---

[17]  Defendants further state that "[a]n expected value analysis would suggest that one should be willing to pay no more than $245,000 (35% multiplied by $700,000) to eliminate such a risk.  No such expected value analysis appears anywhere in the files that Carolina produced in this action."  ECF No. 93 at 17.  Defendants further state that the lead appellate counsel in the underlying action had estimated the probability of success on appeal at 60 to 70 percent, in which case the liability would be zero.  ECF No. 93 at 16.

(1:10cv2492)

- GRANTS summary judgment to Carolina on the issues of standing and statute of limitations and DENIES summary judgment to Defendants on the issues of standing and statute of limitations;

- GRANTS summary judgment to Carolina on the issue of liability as to whether Defendants owed a duty;

- DENIES summary judgment to Carolina on the issue of liability as to breach of duty because a genuine issue of material fact exists as to whether Defendants were informed that the document they drafted was intended to be a final agreement; GRANTS, in favor of Carolina on the issue of whether Defendants were tasked with reducing the 2005 high-low agreement to writing;

- GRANTS summary judgment to Carolina on the issue of liability as to proximate causation;

- DENIES summary judgment to Carolina on the issue of mitigation of damages as to the first and second high-low agreements.

IT IS SO ORDERED.

April 16, 2013                                    _/s/ Benita Y. Pearson_____
Date                                                        Benita Y. Pearson
                                                                United States District Judge